# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| Minnesota Voters Alliance; Mary Amlaw; Ken Wendling; Tim Kirk, | Court File No. 23-CV-2774-NEB-TNL |
| Plaintiffs, | |
| v. | **PLAINTIFFS' REPLY MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR A PRELIMINARY INJUNCTION** |
| Keith Ellison, in his official capacity as Attorney General; Brad Johnson, in his official capacity as Anoka County Attorney, | |
| Defendants. | |

## INTRODUCTION

Above all, Plaintiffs are likely to succeed on the merits, but they also suffer irreparable harm absent and injunction and the balance of harms tips strongly in their favor. This Court should therefore grant Plaintiffs preliminary relief while this case proceeds to the merits.

Despite the Attorney General's insistence to the contrary, AG Reply,[1] Dkt. 44, at 2, Plaintiffs have been clear from the beginning that they make both

---

[1] Defendants include most of their likelihood-of-success-on-the-merits arguments in their reply briefs, consistent with Plaintiffs arguing the merits in their opposition brief and incorporating those arguments in their preliminary injunction memorandum. Thus, while this reply supports Plaintiffs' motion for a preliminary injunction, where necessary or appropriate,

facial and as-applied challenges to the Speech Code. *See* Am. Compl. ¶¶ 22, 97–142. The Attorney General claims that "Plaintiffs do not even identify any speech that the Attorney General has taken action (or threatened to take action) against," but as demonstrated by the Anoka County Counterclaim in this very case, enforcement of the speech code is not a unique power or privilege of the Attorney General—rather, one of the flaws of the Speech Code is that it can be enforced by any local prosecutor, and indeed by private parties seeking prior restraints.

Plaintiffs have absolutely identified speech which is under threat—indeed, the threat has become a formal legal filing before this Court. And in this case this distinction "goes to the breadth of the remedy employed by the Court, not what must be pleaded in a complaint." *Citizens United v. FEC*, 558 U.S. 310, 331 (2010). Plaintiffs clearly have standing to bring an as-applied challenge to the speech they are already being sued over, and therefore likewise have standing to challenge the law facially at the same time, just like any other Plaintiff in any such lawsuit. *See, e.g., Sabri v. Whittier All.*, 833 F.3d 995, 999 (8th Cir. 2016) ("Since they have standing to raise an as applied challenge to the antidefamation bylaw, they may also challenge its overbreadth in a facial challenge."); *Sisney v. Kaemingk*, 886 F.3d 692, 697 (8th Cir. 2018).

---

Plaintiffs deal with Defendants' success-on-the-merits arguments made in their reply submissions.

The County Attorney likewise confuses matters by simply mischaracterizing what Plaintiffs plead in their Amended Complaint. To clarify, "Plaintiffs intend to continue to speak—both through their First Amendment right to petition the courts with their state-court lawsuit, and also in the public square—as to their view of the Minnesota Constitution: felons who have not served their full sentences, or otherwise had their sentences discharged, cannot legally vote." Am. Compl. ¶ 5. Plaintiffs are speaking through this case, through the state court litigation forwarding their view, and through the statements they've made to the media in the meantime—and if not for the chilling effect of the counterclaim, would be speaking about it much more and more often.

Johnson insists that "Plaintiffs Challenge a Statute that Does Not Exist," County Reply, Dkt. 41, at 1, but Johnson apparently believes that statute exists himself, because he brought his counterclaim alleging that Plaintiffs have violated the statute simply by expressing their view. There is no allegation in the Amended (or for that matter the original) Complaint that Plaintiffs have engaged in any conduct other than expressing and disseminating their views, yet Johnson seeks to enjoin the expression of those views. Far from a straw-man, the statute punishes them simply for conveying information Johnson would prefer they not convey—criminalizing pure speech.

That means the Speech Code is a content- and viewpoint- based regulation of pure speech subject to the strictest scrutiny under the First Amendment. There is no exemption from strict scrutiny for political speech about voter eligibility, an obvious "matter[] of public concern." *Snyder v. Phelps*, 562 U.S. 443, 451–52 (2011) (quoting *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 758–759 (1985) (opinion of Powell, J.).

And even if Plaintiffs' speech is not "political," Defendants cannot carry their burden. The law sweeps so broadly that it, by its plain text, allows a County Attorney or the Attorney General to prosecute anyone without any evidence that the state's election process was harmed. Such a chilling effect cannot be tolerated, even if Plaintiffs' speech is "false." *See United States v. Alvarez*, 567 U.S. 709, 733 (2012) (Breyer, J., concurring) ("[T]he threat of criminal prosecution for making a false statement can inhibit the speaker from making true statements, thereby 'chilling' a kind of speech that lies at the First Amendment's heart."). Defendants defend the Speech Code by minimizing its constitutional infirmities, but none of their arguments stick.

Defendants strive in vain to defend a Speech Code that is pure paternalism and nothing else. Plaintiffs are likely to succeed on the merits, and each factor in the *Dataphase* analysis favors Plaintiffs. This Court should grant Plaintiffs a preliminary injunction while this case proceeds to the merits.

## ARGUMENT

**I.  If the Court determines that Plaintiffs are likely to succeed on the merits, it should issue a preliminary injunction.**

The Attorney General claims that Plaintiffs bear the burden of establishing a likelihood of success on the merits here. This appears to be based on their argument that strict scrutiny should not apply here. AG PI Opp., Dkt. 45, at 3. To cut through the fog, the Eighth Circuit made the analysis in a situation like this one clear in *Dakotans for Health v. Noem*, 52 F.4th 381 (8th Cir. 2022): Plaintiffs must indeed show they are "likely to succeed on the merits," *id.* at 388, but if they demonstrate that a higher level of scrutiny applies, Defendants must show that the law advances a compelling state interest and is narrowly tailored to it, *id.* at 390 (noting that the "*State has not shown* that tighter restrictions on paid circulators [in the form of SB 180] have a substantial relationship to a sufficiently important government interest (emphasis added)).

Thus, if the Court finds that *either* intermediate or strict scrutiny applies, it is Defendants' burden to show that the law is constitutional. If they fail, Plaintiffs are "likely to succeed on the merits." *See id.* Because of this factor's importance, Plaintiffs focus largely (again) on it in reply.

## II.    Plaintiffs' speech is political speech.

County Attorney Johnson continues to insist that Plaintiffs' speech about the rules governing the political process in Minnesota is not "political speech" subject to the highest level of constitutional scrutiny. County Reply at 5. The Supreme Court, however, says otherwise. Decades of Supreme Court case law hold "[s]peech on 'matters of public concern' . . . is 'at the heart of the First Amendment's protection.'" *Snyder v. Phelps*, 562 U.S. 443, 451–52 (2011) (quoting *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 758–759 (1985) (opinion of Powell, J.). Because "speech concerning public affairs is more than self-expression; it is the essence of self-government," the Supreme Court holds that "speech on public issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection." *Snyder*, 562 U.S. at 452 (first quoting *Garrison v. Louisiana*, 379 U.S. 64, 74-75 (1964), and then quoting *Connick v. Myers*, 461 U.S. 138, 145 (1983)).

According to Johnson, "political speech relates to the substance of an issue presented to voters—'policy issues, party preference, candidate credentials, candidate positions, putative facts about issues covered by ballot questions, and the like.'" County Reply, Dkt. 41, at 6 (quoting *United States v. Mackey*, 652 F. Supp. 3d 309, 345 (E.D.N.Y. 2023)). To the County Attorney, "Plaintiffs' speech is not political because it does not relate to the substance of a political

issue that is before the voters in any way, through a ballot question or otherwise." *Id.*

But political speech—and speech on matters of public concern, more appropriately[2]—is not limited to issues before the voters. Rather, "[s]peech deals with matters of public concern when it can 'be fairly considered as relating to any matter of political, social, or other concern to the community,' . . . or when it 'is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public.'" *Snyder*, 562 U.S. at 453 (first quoting *Connick*, 461 U.S. at 146, and then quoting *City of San Diego v. Roe*, 543 U.S. 77, 84 (2004)).

Take the facts of *Snyder*: the Westboro Baptist Church "believes that God hates and punishes the United States for its tolerance of homosexuality, particularly in America's military." *Id.* at 448. They therefore chose to picket Matthew Snyder's funeral carrying "signs [that] reflected the church's view that the United States is overly tolerant of sin and that God kills American soldiers as punishment." *Id.* at 447. What was the issue before the voters there?

---

[2] The *Alvarez* Court did not limit the First Amendment's highest rung of protection only to "political" statements, but rather any statement on a "matter of public concern." All nine justices agree that such speech is entitled to "instrumental constitutional protection." *E.g.*, *Alvarez*, 567 U.S. at 751 (Alito, J., dissenting) ("Laws restricting false statements about philosophy, religion, history, the social sciences, the arts, and other matters of public concern would present such a threat.").

There was no ballot question[3] related to homosexuality in Maryland in 2006, nor any formal referendum on foreign military interventions. Westboro Baptist's signs mentioned no candidate for office, nor any government official. *Id.* at 448. Yet the Court held, "Westboro's signs plainly relate[d] to broad issues of interest to society at large, rather than matters of 'purely private concern.'" *Id.* at 454 (quoting *Dun & Bradstreet*, 472 U.S. at 759).

Nor is it true that "Laws that regulate the who, what, where, and when of an election do not target political speech." County Reply, Dkt. 41, at 6. Even the basic question of what is printed on a ballot often implicates First Amendment rights of speech and association and is subject to constitutional scrutiny. *See, e.g.*, *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997) (explaining that ballot access requirements implicate First Amendment rights); *Storer v. Brown*, 415 U.S. 724 (1974) (same); *see also Tashjian v. Republican Party*, 479 U.S. 208, 210 (1986) (holding that closed primary requirement violated First Amendment rights).

---

[3] *Mansky* also forecloses Johnson's implicit argument that any speech about voter eligibility not expressly couched as opinion—how the world "should be"— is not political unless it is on a ballot or related to "policy issues." Not only did the *Mansky* Court directly reject the State's attempt to outlaw "Please I.D. Me" buttons at the polling place—even though there was and is no voter ID requirement in Minnesota elections—but also such a definition creates utter subjectivity in whether speech is subject to prosecution. *See Minn. Voters All. v. Mansky*, 138 S. Ct. 1876, 1891 (2018) ("A shirt simply displaying the text of the Second Amendment? Prohibited. . . . But a shirt with the text of the First Amendment? 'It would be allowed.'").

Indeed, election regulations "often will directly restrict or otherwise burden core political speech and associational rights." *Buckley v. Am. Constitutional Society*, 525 U.S. 182, 206 (1999) (Thomas, J., concurring). That is why states cannot prohibit voters from photographing their marked ballots, *see Rideout v. Gardner*, 838 F.3d 65, 75–76 (1st Cir. 2016) (striking down a prohibition on "ballot selfies" because the law "reaches and prohibits innocent political speech by voters unconnected to the State's interest in avoiding voter buying or voter intimidation"), prevent voters from wearing buttons saying "Please I.D. Me" on election day even where voter ID is not a voting requirement, *see Mansky*, 138 S. Ct. at 1892, and cannot prohibit political speech within 500 feet of a polling place, *see Anderson v. Spear*, 356 F.3d 651, 666 (6th Cir. 2004).

More importantly, Johnson's attempt to bifurcate speech about voting procedures from speech about candidates and ballot proposals falls short, because disputes about voting procedures are themselves important matters of public debate: Should Minnesota require voters to provide identification, or does that impose a burden that will disenfranchise too many voters? Should mail-in ballots be widely available, or are such ballots overly susceptible to fraud? Should 16-year-olds be allowed to vote; should immigrants; should felons?

Johnson ultimately must fall back on arguing that Plaintiffs' "conflate statements that felons **should not** be allowed to vote and statements that

felons **are not** allowed to vote." County Reply at 6 (emphasis in original). But Plaintiffs make no such conflation—their argument is, simply and directly, that felons not "restored to civil rights" *are not* allowed to legitimately vote in Minnesota. To Plaintiffs, the new Felon Voting Law conflicts with the Constitution.[4] That statement is about the appropriate legal interpretation of the Minnesota Constitution, and they need not wait for state courts to agree with them to make it (though at least one state court already has, *see* Pl.'s Opp. Mem., Dkt. 32, at 8, 22, 32 (discussing Mille Lacs County sentencing orders)).

Indeed, even if the Minnesota Supreme Court ultimately disagrees, Plaintiffs' statements remain valid political speech: when campaign finance reformers insist "corporations are not people," it's not because they're in denial, or ignorant of the Supreme Court's holding in *Citizens United v. Federal Election Commission*, 558 U.S. 310 (2010); when social conservatives insisted that the constitution did not protect a right to abortion, they knew very well that *Roe v. Wade*, 410 U.S. 113 (1973) said otherwise. These are claims about the *proper* interpretation of relevant law, and that interpretation is proper or improper independent of whether existing institutions get the answer wrong or right. This Court should not hold that civil rights activists were spreading

---

[4] As Defendants note, the state district court held that the Felon Voting Law is constitutional. *See* Stover Decl. Ex. B, Dkt. 43-2. That decision was wrong, so Plaintiffs have appealed it and sought accelerated review from the Minnesota Supreme Court. Dickey Decl., Jan. 9, 2023, Ex. 1.

misinformation when they insisted Separate was not Equal. *Cf. Plessy v. Ferguson*, 163 U.S. 537 (1896).

Finally, the County Attorney claims that "Courts have routinely upheld government regulation of speech that is related to politics only because it discusses election procedures." County Reply, Dkt. 41, at 5. For this striking proposition, he cites a recent district court opinion about allegedly deceptive Twitter memes—and even that case does not support the argument. *Id.* at 6 (citing *United States v. Mackey*, 652 F. Supp. 3d 309, 345 (E.D.N.Y. 2023)). Such a practice cannot be all that routine; the County Attorney's only real authority is *Mackey*, a decision so recent it's still in the middle of briefing on appeal in the Second Circuit (*see* 2nd Cir. No. 23-7577). Even if the Second Circuit were to eventually affirm Doug Mackey's conviction, the reasoning does not extend to this case.

The trial court found that "Mackey's Deceptive Tweets are most accurately characterized as a vehicle or means for illegal conduct," and fell within that traditional exception. *Mackey*, 652 F. Supp. 3d at 344. "Treason is still treason if it is spoken aloud. Conspiracy is still criminal if it is communicated verbally. A supervisor who publicly orders a subordinate to discriminate has violated anti-discrimination laws, despite acting through their utterances." *Id.* Or as the Supreme Court has explained, "words can in some circumstances violate laws directed not against speech but against conduct," *R.A.V. v. City of St.*

*Paul*, 505 U.S. 377, 389 (1992). "Where the government does not target conduct on the basis of its expressive content, acts are not shielded from regulation merely because they express a discriminatory idea." *Id.* at 390. For instance, "sexually derogatory 'fighting words,' among other words, may produce a violation of Title VII's general prohibition against sexual discrimination in employment practices." *Id.* at 389.

Contrary to the County Attorney's claims, speech discussing election-related issues that is not a means for illegal conduct, even if false or misleading, is still political speech. The Eighth Circuit has made that clear: "the Supreme Court has never placed knowingly false campaign speech categorically outside the protection of the First Amendment." *281 CARE Committee v. Arneson*, 638 F.3d 621, 633–34 (8th Cir. 2011) (*281 CARE Committee I*); *see also State ex rel. Pub. Disclosure Comm'n v. 119 Vote No! Comm.*, 957 P.2d 691 (Wash. 1998) (explaining that "the State's claimed compelling interest to shield the public from falsehoods during a political campaign is patronizing and paternalistic" and striking down a prohibition on false political advertising).

Here, the government has not targeted conduct and swept up pendent speech. Rather, Minnesota has outlawed simply "caus[ing] information to be transmitted" that state officials (or private parties) disagree with—and even authorized the prior restraint of that transmittal. That is the criminalization

of pure political speech on matters of public concern, and it should be subject to strict scrutiny.

### III. Even if Plaintiffs' speech is not "political," the Speech Code is an unconstitutional, content-based prohibition on speech, not a permissible regulation of elections.

Government "has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Reed v. Town of Gilbert*, 576 U.S. 155, 162 (2015). In *Reed*, the Supreme Court made clear that "[c]ontent-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Id.*

That rule in *Reed* applied to a Town's Sign Code that imposed its most stringent restrictions on "Temporary Directional Signs" which directed the public to church or some other "qualifying event." *Id.* at 164. The fact that the directional signs were not political posters did not matter to the Court: "the Church's signs inviting people to attend its worship services are treated differently from signs conveying other types of ideas. On its face, the Sign Code is a content-based regulation of speech. . . . it is subject to strict scrutiny." *Id.* at 164–65. The reason why was simple: content-based restrictions create a real "danger of censorship." *Id.* at 167. In that case, "one could easily image a Sign Code compliance manager who disliked the Church's substantive teachings

deploying the Sign Code to make it more difficult for the Church to inform the public of the location of its services." *Id.* at 167–68.

Defendants try to divert this Court from seeing these same dangers in the Speech Code. Both gloss over its broad language, fail to quote much of the actual text, and then conclude that it is a minor election regulation. Nothing to see here, say the Defendants. Understanding the broad array of speech the Speech Code prohibits, however, and the lack of limitations on its reach, proves that the opposite is true.

### A.    The Speech Code is a content-based regulation.

"Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed." *Id.* at 163. To determine if a regulation is content-based, the court must consider whether the law "draws distinctions based on the message a speaker conveys." *Id.* This includes distinctions based on message such as "regulat[ing] speech by particular subject matter" and distinctions based on the "function or purpose" of speech. *Id.* In either case, "distinctions [are] drawn based on the message a speaker conveys, and therefore, are subject to strict scrutiny." *Id.* at 163–64. The same is true for "laws that cannot be 'justified without reference to the content of the regulated speech,' or that were adopted by the government 'because of disagreement with the message [the speech]

conveys.'" *Id.* at 164 (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)).

The Speech Code obviously fits the bill. Subdivision one prohibits "direct[] or indirect[]" threats "with the intent to compel that person to register or abstain from registering to vote, vote or abstain from voting, or vote for or against a ballot question" or "with the intent to impede that person's efforts to encourage another to cast a ballot or assist another in registering to vote, traveling to a polling place, casting a ballot, or participating in any other aspect of the election process." Minn. Stat. § 211B.075, subd. 1(a). That part of the Speech Code obviously "defin[es] regulated speech by its . . . purpose." *Reed*, 576 U.S. at 163. The law targets certain speech attempting to persuade people not to vote, or from assisting others in registering to vote, for example.[5] The same is true of Subdivision 3. It, by its plain text, reaches speech that "hinder[s], [or] interfere[s] with . . . voting, registering to vote, or aiding another person in casting a ballot or registering to vote." Minn. Stat. § 211B.075, subd. 3. Just like in *Reed*, where directional signs were treated worse than political ones, speech encouraging abstaining from voting is treated worse than speech encouraging voting. *See also Barr v. Am. Assoc. of Political Consultants*, 140 S. Ct. 2335, 2346 (2020) (plurality) (holding that law favoring

---

[5] As discussed below, Subdivision 1 does *not* only apply to true threats.

government debt-collection robocalls above political and other robocalls was content-based and subject to strict scrutiny).

Subdivision 2 goes even further. It prohibits the transmission of "information . . . by any means" that is "intend[ed] to impede or prevent another person from exercising the right to vote" and is known to be "materially false." *Id.* § 211B.075, subd. 2(a). That is another regulation on speech because of its "function or purpose." *Reed*, 576 U.S. at 163; *see Alvarez*, 567 U.S. at 728 (explaining that the prohibition on false speech in the Stolen Valor Act was a "content-based mandate"). And the conversation topics that fall within Subdivision 2 are also defined by "particular subject matter," *Reed*, 576 U.S. at 163: "information regarding the time, place, or manner of holding an election; the qualifications for or restrictions on voter eligibility at an election; and threats to physical safety associated with casting a ballot." Minn. Stat. § 211B.075, subd. 2(b). In sum, all subdivisions of the Speech Code are undeniably content-based restrictions, deserving of strict scrutiny.

**B.    Although Subdivision 2 of the Speech Code applies to speech that is alleged to be "materially false," it still does not satisfy exacting or strict scrutiny.**

Defendants attempt to bypass the clear directions in *Reed* by claiming that Plaintiffs' speech is "materially false," so it can be aggressively regulated based on *United States v. Alvarez*, 567 U.S. 709 (2012) and *Animal Legal Defense Fund v. Reynolds*, 8 F.4th 781 (2021) (applying the "specific result" from

16

*Alvarez*). *See* Dkt. 41 at 3; Dkt. 44 at 3.[6] To make this claim, the County Attorney has created "an entire Potemkin village" of legal rules by quoting Justice Breyer's concurring opinion in *Alvarez* and claiming that the entire "*Alvarez* Court" blessed regulations targeting falsehoods. Dkt. 41 at 1, 2.

The problem for Defendants, however, is that the "specific result"—the determination that the Stolen Valor Act was unconstitutional—is the only part of *Alvarez* that binds in the Eighth Circuit. *Reynolds*, 8 F.4th at 785. Even considering both the plurality and Justice Breyer's reasoning, neither of which is a logical subset of the other, the Speech Code fails to satisfy the First Amendment. *See id.* (considering the reasoning from both opinions).[7]

---

[6] The Attorney General goes further and asserts that false statements are entirely unprotected. This conclusion flies in the face of *Alvarez*, where both the plurality and concurrence applied *at least* intermediate scrutiny to false speech. *See Animal Legal Def. Fund v. Kelly*, 9 F.4th 1219 (10th Cir. 2021) (explaining that the plurality and concurring opinion in *Alvarez* "agree that restrictions on false statements of fact can be subject to First Amendment scrutiny requiring the government to provide a justification"). Indeed, even in *Mackey*, the district court acknowledged that Mackey's "false utterances" were "subject to an intermediate scrutiny analysis." *Mackey*, 652 F. Supp. 3d at 344.

[7] As discussed above, Plaintiffs wish to engage in core political speech by sharing their interpretation of the Minnesota Constitution and the Felon Voting Law. As the court explained in *281 CARE Committee II*, "*Alvarez* is not dispositive" when political speech is at issue. *281 CARE Committee v. Arneson*, 766 F.3d 774, 783 (8th Cir. 2014) (*281 CARE Committee II*). If the Court agrees that Plaintiffs' speech is political or on matters of public concern, it need not apply *Alvarez*.

In *Alvarez*, the Supreme Court confronted a law that "target[ed] falsity and nothing more." 567 U.S. at 709 (plurality). Respondent Xavier Alvarez, a notorious fibber, was prosecuted under the Stolen Valor Act when he lied about having received the Congressional Medal of Honor at public, local government meetings. Six Justices agreed that the Act violated the First Amendment, but they could not agree on the appropriate level of constitutional scrutiny to apply to the broad prohibition on the uttering of *any* lie about receipt of the Medal.

According to the plurality, false speech is not generally exempted from the First Amendment, so because the Stolen Valor Act authorized the prosecution of speech based on its content, "exacting scrutiny [was] required." *Id.* at 709, 715. Under strict scrutiny, the Stolen Valor Act failed to measure up. There was no evidence that the Act was "actually necessary" to protect "the integrity of the Medal of Honor." *Id.* at 725–26 (quoting *Brown v. Entertainment Merchants Assn.*, 564 U.S. 786, 799 (2011)). Indeed, the Government pointed to "no evidence to support its claim that the public's general perception of military awards is diluted by false claims." *Id.* at 726. Furthermore, the Government could not show "why counterspeech would not suffice to achieve its interest." *Id.* "The remedy for speech that is false is speech that is true." *Id.* at 727. Everyone already knew Alvarez was an impostor, and he was ridiculed online for his lies. *Id.* at 726–27. The Stolen Valor Act was far from the least restrictive means of fulfilling the Government's interest as well. It sought "to

18

control and suppress all false statements on this one subject in almost limitless times and settings." *Id.* at 722–23. A much less-restrictive alternative was readily available: "[a] Government-created database could list Congressional Medal of Honor recipients. Were a database accessible through the Internet, it could be easy to verify and expose false claims." *Id.* at 729. Point being, such a broad, content-based restriction could not survive the First Amendment.

The same is true here. As Plaintiffs have already explained, *see* Dkt. 32 at 37–39, there is no evidence that the Speech Code is "actually necessary." *Id.* at 725–26. Besides Defendants' vague reference to disinformation lurking in the shadows, there is no evidence that Minnesotans are actually being confused about voter eligibility requirements by Plaintiffs', or anyone's, speech. As the plurality in *Alvarez* explained, the fact that falsehoods exist does not give the government unbridled freedom to act, even if those falsehoods make the listener "experience anger and frustration." *Id.* at 726. Indeed, like in *Alvarez*, the better alternative is counterspeech. The state has already done just that. The Secretary of State has published webpages explaining when, according to the Secretary, those still serving felony convictions can vote in Minnesota,[8] issued press releases touting that felons not currently incarcerated "are now

---

[8] *See I Have a Criminal Record*, Office of the Minnesota Secretary of State Steve Simon, https://www.sos.state.mn.us/elections-voting/register-to-vote/i-have-a-criminal-record/ (last accessed Jan. 6, 2024).

able to register to vote,"[9] and provided signs at the polling place advising the same.[10] Like the possible database in *Alvarez* of Medal of Honor recipients, the government's own counterspeech on the subject of felon voting in Minnesota is perfectly adequate to "expose false claims" (false in the government's eyes, at least) about voter eligibility. Defendants have no evidence that it needs to also prosecute speakers like Plaintiffs.

Justice Breyer's concurrence provides no safe haven for the Speech Code either. Instead, the concurrence remarked that "the threat of criminal prosecution for making a false statement can inhibit the speaker from making true statements, thereby 'chilling' a kind of speech that lies at the First Amendment's heart." *Id.* at 733 (Breyer, J., concurring). Furthermore, such prohibitions "provide[] a weapon to a government broadly empowered to prosecute falsity without more. And those who are unpopular may fear that the government will use that weapon selectively." *Id.* at 734. As a result of this very real danger, the concurrence looked for "limiting features" for a regulation

---

[9] *Voting Rights Restored to Formerly Incarcerated Minnesotans*, Office of the Minnesota Secretary of State Steve Simon (June 2, 2023) https://www.sos.state.mn.us/about-the-office/news-room/voting-rights-restored-to-formerly-incarcerated-minnesotans/ (last accessed Jan. 6, 2024).

[10] *See Polling Place Posters*, Office of the Minnesota Secretary of State Steven Simon, https://www.sos.state.mn.us/election-administration-campaigns/election-administration/polling-place-posters/ (last accessed Jan. 6, 2023).

on false speech to be constitutional. *Id.* at 736. Justice Breyer found other example statutes: "in virtually all these instances [of constitutional regulations] limitations of context, requirements of proof of injury, and the like, narrow the statute to a subset of lies where specific harm is more likely to occur." *Id.* at 736.

There is no such narrowing in the Speech Code. Start with the private right of action. It allows "any person injured by an act prohibited by this section" to bring a civil action. Minn. Stat. § 211B.075, subd. 5(b), (c). The Speech Code does not define what it means to be "injured" by another person's speech. Is simply hearing it enough? There is nothing in the text requiring more, such as a limitation that the person was physically prevented from voting—or prevented from voting at all. Indeed, the Speech Code allows a private action to be brought "if there is a reasonable basis to believe that an individual or entity is committing or intends to commit a prohibited act." In other words, the statute deputizes members of the public to prosecute speech that may very well, just like Mr. Alvarez's, turn out to be harmless. And these actions can be brought before *any* supposed harm is done because *no words have even been uttered*.

Even worse, the Attorney General and any County Attorney are free to bring a civil action even if *no one* is injured by the speech in question. *See* Minn. Stat. § 211B.075, subd. 5(b). An ambitious County Attorney can bring a civil

action for speech about voter eligibility that harms no one. Indeed, the County Attorney has already brought a counterclaim for Plaintiffs' statements that "felons still serving their sentences do not have a right to vote in Minnesota" and "felons still serving their sentences do not have a right to vote in Minnesota because the Minnesota Constitution preempts the Felon Voting Law." Dkt. 16, at 27 (Amended Counterclaim). Nowhere in the counterclaim is there an allegation that those statements injured *anyone*. Indeed, there is not even an allegation that any felons in Minnesota have heard what Plaintiffs have to say.

Both Defendants want to ignore the fact that the Speech Code lacks an injury requirement by focusing on Subdivision 2's application to speech that is "materially false." But just because a false statement is "material" does not mean that it "accomplish[es] a legally cognizable harm." *Reynolds*, 8 F.4th at 786. That ingredient is notably absent from the Speech Code. And, as Justice Breyer's concurrence and Eighth Circuit precedent make clear, a legally cognizable harm is not the kind of ingredient the First Amendment allows the government to leave out.

In *Reynolds*, the "legally cognizable harm" addressed by the Access Provision of the challenged law was apparent: the Plaintiffs' lies lead to trespass, "an ancient cause of action" addressing "violation[s] of the right to

exclude." *Id.*[11] Similarly, the district court in *Mackey* held that 18 U.S.C. § 241 met the standard set out in *Alvarez* because "the Government seeks to prosecute only lies associated with the 'legally cognizable harm' resulting from criminal conspiracy to injure voting rights." *Mackey*, 625 F. Supp. 3d at 345. The federal statute at issue in that case was, by its text, limited only to "conspiracy to 'injure.'" *Id.* (quoting 18 U.S.C. § 241).

And all the permissible statutes cited by Justice Breyer in *Alvarez* required something similar. Fraud statutes, for example, "typically require proof of a misrepresentation that is material, upon which the victim relied, and which caused actual injury." *Alvarez*, 567 U.S. at 734 (Breyer, J., concurring). Contrary to the Attorney General's arguments, Subdivision 2 fails to function as a permissible fraud statute because it contains *no* requirement that Plaintiffs' speech caused "actual injury." The same is true for torts involving the intentional inflection of emotional distress: they "concern falsehoods that tend to cause harm to a specific victim of an emotional-, dignitary-, or privacy-

---

[11] The Eighth Circuit just issued a second *Reynolds* decision evaluating a new intent requirement in Iowa's Agricultural Production Facility Fraud Act. As before, the court reaffirmed that the statute was "consistent with the First Amendment," because it "permissibly forbids false statements that result in a legally cognizable harm." *Animal Legal Defense Fund v. Reynolds (Reynolds II)*, No. 22-1830, *7 (8th Cir. Jan. 8, 2024). The addition of an intent requirement did not make the statute a content-based regulation as it did "not impose further restrictions based on the speech's communicative content," *id.* at *8—which the Speech Code, on the other hand, plainly does.

related kind." *Id.* And in trademark laws, the harm is also baked in. There, "infringement caus[es] confusion among potential customers (about the source) and thereby dilute[es] the value of the mark to its owner, to consumers, and to the economy." *Id.* at 735. There is no similar requirement in the Speech Code that speakers cause some sort of harm before being subject to a civil action. In fact, "[a]s written, it applies in family, social, or other private contexts, where lies will often cause little harm. It also applies in political contexts, where although such lies are more likely to cause harm, the risk of censorious selectivity by prosecutors [the Attorney General, County Attorneys, and private individuals] is also high." *Id.* at 736. Unlike in trademark cases, where economic value is at stake, there is no presumption that the utterance of an alleged falsehood automatically hurts what the government claims is true.

As a result, Subdivision 2 also cannot be saved by the presence of a *mens rea* requirement. In his *Alvarez* concurrence, Justice Breyer acknowledged that "given haziness of individual memory along with the large number of military records covered" by the Stolen Valor Act, there was a very real risk that individuals could accidentally find themselves in legal trouble. *Id.* As a result, there is a "risk of chilling that is not completely eliminated by *mens rea* requirements; a speaker might still be worried about being *prosecuted* for a careless false statement, even if he does not have the intent required to render

him liable." *Id.* The Eighth Circuit, just after *Alvarez* was decided, saw the same problem with Minn. Stat. § 211B.06 in *281 CARE Committee II*:

> The risk of chilling otherwise protected speech is not eliminated or lessened by the mens rea requirement because, as we have already noted, a speaker might still be concerned that someone will file a complaint with the OAH, or that they might even ultimately be prosecuted, for a careless false statement or possibly a truthful statement someone deems false, no matter the speaker's veracity.

766 F.3d at 794.

The same is true for the Speech Code. Election laws can be confusing, and speaking about them with complete accuracy requires an understanding of the relationship between state law and the state constitution. Plaintiffs genuinely believe that Article VII, Section 1 of the Minnesota Constitution requires a felon to be "restored to civil rights" before voting, which means that the new Felon Voting Law, which only restores "the civil right to vote," Minn. Stat. 201.014, subd. 2a (2023), is unconstitutional. Am. Compl. ¶ 53. Similarly, they believe that those under guardianship cannot vote in Minnesota. *Id.* ¶ 77.

Speaking about these genuine, reasonable beliefs is now risky in Minnesota. For example, Plaintiffs may wish to quote the Minnesota Constitution by saying: "The following persons shall not be entitled or permitted to vote at any election at any time . . . a person under guardianship." Minn. Const. art. VII, § 1. But they are now fearful to say what the Constitution says because one state district court—not the Minnesota Supreme Court—has held that this

provision of the constitution is unconstitutional. *See In re Brian W. Erickson*, Minn. Dist. Ct. No. 27-GC-PR-09-57, Order, Oct. 4, 2012.

Just like how a military veteran with a hazy memory may be worried about being prosecuted under the Stolen Valor Act for discussing his military honors, a Minnesotan with an imperfect understanding of Minnesota election laws may be fearful of speaking with friends and neighbors about what the state Constitution says. The result is the same: "the prohibition may be applied where it should not be applied, for example, to barstool braggadocio, or, in the political arena, subtly and selectively to speakers that the Government does not like." *Alvarez*, 567 U.S. at 736 (Breyer, J., concurring).

It makes no difference that claims under the Speech Code can only be brought in district court where there are some procedural protections, like the Attorney General claims. *See* Dkt. 44 at 7. It was the *risk* of selective prosecution in *Alvarez*, a case also dealing with claims starting in the courts, that made the Stolen Valor Act unconstitutional. Likewise, it was the *identity* of the potential plaintiffs in *281 CARE Committee II*—including political opponents—which made section 211B.06 unconstitutional. 766 F.3d at 790 ("it is immensely problematic that *anyone* may lodge a complaint with the OAH alleging a violation of § 211B.06") (emphasis original). Plaintiffs dispute that their discussion of voter eligibility is materially false, but even accepting Defendants' argument that it is, the chilling effect of Subdivision 2 cannot be

26

denied. Like in *Alvarez*, "the statute as written risks significant First Amendment harm." *Id.*

### C. Subdivisions 1 and 3 of the Speech Code are not limited to false speech and do not survive constitutional scrutiny.

Defendants attempt to sneak the entire Speech Code within the reasoning of *Alvarez*. In doing so, they fail to acknowledge that Subdivisions 1 and 3 apply to speech that is not even false. These are content-based restrictions on speech that are totally unconnected from legally cognizable harm. Nowhere lurking in *Alvarez* is a permission slip for the government to prohibit *truthful* speech using a content-based regulation, even in the dissent.

Consider the following example. Subdivision 1 prohibits "direct[] or indirect[]" threats of harm "inten[ded] to impede that person's efforts to encourage another to cast a ballot or assist another in registering to vote." Minn. Stat. § 211B.075, subd. 1(a)(2). Minnesota also has laws on the books, however, limiting a person's ability to help others vote. An agent of an individual's union or employer may not help "[a] voter who claims a need for assistance" in marking their ballot. *Id.* § 204C.15, subd. 1. Agents delivering or mailing completed absentee ballots may only return the ballots of three voters in an election. *Id.* § 203B.08(b). An organization committed to election

integrity, like the Minnesota Voters Alliance, may[12] wish to publicize election laws and remind Minnesotans that there are legal penalties, including a potential felony conviction, for violating them. *See, e.g.*, *id.* § 203B.03, subd. 2.

Such information could (wrongly) be considered an indirect "threat" of "harm, or loss," with the intent to impede a person's *unlawful* efforts to "encourage another to cast a ballot or assist another in registering to vote" or "participat[ion] in any other aspect of the election process." *Id.* § 211B.075, subd. 1(a). And it may very well also violate Subdivision 3's prohibition on "intentionally hinder[ing]" someone from "aiding another person in casting a ballot." *Id.* § 211B.075, subd. 3. *Dishonest* speech telling Minnesotans that they can collect unlimited absentee ballots, on the other hand, falls outside of the Speech Code's ambit. Point being, the prohibitions in Subdivisions 1 and 3 forbid true speech and work as a one-way ratchet. But if you engage in activity which could lead to voter fraud by encouraging illegal voting, you won't be prosecuted under the Speech Code. The Speech Code expressly "draws distinctions based on the message a speaker conveys." *Reed*, 576 U.S. at 156.

---

[12] Because of the Speech Code, Plaintiffs stop here to note that they are providing this as a hypothetical to show the problems with the application of the law beyond the Plaintiffs themselves. MVA does not want to risk another meritless claim against it for speech it has not uttered and may or may not utter.

The court must therefore consider if these subdivisions survive the most exacting scrutiny.

## IV. The Speech Code Violates the First Amendment in numerous respects.

As discussed thoroughly above and in Plaintiffs' opposition brief to Defendants' motions, *see* Dkt. 32 at 24–37; Dkt. 35 (incorporating Plaintiffs' opposition arguments for success-on-the-merits discussion), the Speech Code suffers from numerous constitutional infirmities including that it applies to speech that is not a true threat, is overbroad, and underinclusive,[13] unconstitutionally vague, and is a prior restraint. Defendants fail to rebut these arguments with their quick gloss over the actual text of the Speech Code.

### A. The Speech Code does not cover only true threats.

The Attorney General provides a very general definition of speech that constitutes an unprotected true threat. The First Amendment, however, does not allow the Court to so quickly assume that Speech falls into this category. "A true threat is a statement that a reasonable recipient would have interpreted as a serious expression of an intent to harm or cause injury to another." *Brandy v. City of St. Louis*, 75 F.4th 908, 915 (8th Cir. 2023) (quoting

---

[13] Defendants fail to meaningfully address Plaintiffs' argument that the Speech Code is underinclusive. *See* Dkt. 32 at 31–32. As a result, the Speech Code fails to "advance a stated interest in preventing a fraud." *281 Care Committee II*, 766 F.3d at 795.

*Doe v. Pulaski Cnty. v. Special Sch. Dist.*, 306 F.3d 616, 624 (8th Cir. 2002) (en banc)). Key in this inquiry is intent *to injure*: "a court must view the relevant facts to determine 'whether the recipient of the alleged threat could reasonably conclude that it expresses a determination or intent to injure presently or in the future.'" *Id.* (quoting *Doe*, 306 F.3d at 622).

Missing from the Speech Code is any requirement of a speaker's intent to injure. Indeed, Subdivision 1 covers "direct[] or indirect[] use of threaten[ed] force, coercion, violence, restraint, damage, harm or loss, including loss of employment or economic reprisal." Minn. Stat. § 211B.075, subd. 1(a). And anyone can bring an action under the Speech Code for speech that "would cause a reasonable person to feel intimidated." *Id.* § 211B.075, subd. 1(b). Intimidation, without more, is not enough.

> Even where emotional distress is reasonably expected to result, the First Amendment prohibits Congress from punishing political speech intended to harass or intimidate in the broad sense of these words. The Free Speech Clause protects a variety of speech that is intended to trouble or annoy, or to make another timid or fearful.

*United States v. Sryniawski*, 48 F.4th 583, 587 (8th Cir. 2022). Intimidation can only be "constitutionally proscrib[ed] . . . where the speaker intends to place the victim 'in fear of bodily harm or death.'" *Id.* (quoting *Virginia v. Black*, 583 U.S. 343, 360 (2003)).

There is no such requirement in Subdivision 1. It applies to threats of "loss of employment or economic reprisal." Minn. Stat. § 211B.075, subd. 1(a). And,

as discussed above, it would presumably cover discussions of Minnesota's many laws limiting an individual's ability to "encourage another to cast a ballot," and the serious criminal penalties associated with each. *Id.* § 211B.075, subd. 1(a)(2); *see id.* § 204C.15, subd. 1; § 203B.08, subd. 1(b). The plain language of the Speech Code obviously proscribes more than true threats.

Furthermore, the entire Speech Code reaches discussions about voting requirements *at large* that may not be directed at any individual. This case is therefore a far cry from *Nat'l Coalition on Black Civic Participation v. Wohl*, 512 F. Supp. 3d 500, 510–11 (S.D.N.Y. 2021), where the court held that *direct* communications *to voters* falsely threatening consequences like forced vaccination for voting by mail constituted intimidation. Plaintiffs expressly allege that they have not directed their speech at anyone. Am. Compl. ¶¶ 61–68.

Indeed, that distinction made all the difference in *Fair Fight Inc. v. True the Vote*, No. 2:20-CV-00302-SCJ, 2024 U.S. Dist. LEXIS 22, (N.D. Ga. Jan. 2, 2024). There, it was alleged that True the Vote (TTV) "intimidate[d] . . . person[s] from voting or attempting to vote," in violation of the Voting Rights Act, by sending out a number of communications, including "large scale press releases" and "publicly available podcasts both of which were accessible by anyone." *Id.* at *130, 132. The court explained that *Wohl* did not apply because TTV's "actions were not directed at any particular voter." *Id.* at *132.

Furthermore, no one had testified to seeing or hearing the public communications or having any direct contact with TTV. *Id.* TTV's public communications did not constitute intimidation, even including statements "threatening to release challenged voters' names," because "there [was] no evidence . . . that any voter in George saw this post to be intimidated by it." *Id.* at *133 n.75.

The court in *True the Vote* also explained that there would be "First Amendment concerns" in holding that those social media posts were illegal. *Id.* at *133. There was no evidence that TTV's statements "were intended to be violent" and therefore they did not constitute true threats. *Id.* at *133 (citing *Counterman v. Colorado*, 600 U.S. 66, 143 S. Ct. 2106 (2023), for what a true threat is).

The Speech Code, by its plain language, allows anyone in Minnesota to bring a civil action for speech that is, like TTV's, "not intended to be violent" and not directed at a specific individual. The Amended Counterclaim is case-in-point. The Speech Code applies to even hypothetical good-faith public communications warning Minnesotans that there may be consequences for taking certain election-related actions, in addition to other statements that do not constitute true threats. Such a system implicates serious First Amendment concerns.

**B.     The Speech Code is overbroad.**

Plaintiffs have identified ample speech that could be penalized under the Speech Code that is protected. To start, statements that are "materially false" but unconnected to a "legally cognizable harm" are protected under the First Amendment. *Reynolds*, 8 F.4th at 786. That means Plaintiffs' statements about voter eligibility, as neither Defendant has alleged these statements harmed anyone, are protected speech. Yet the broad reach of the Speech Code, as demonstrated by the counterclaim Plaintiffs already face, "provides a weapon to government broadly empowered to prosecute falsity without more." *Alvarez*, 567 U.S. at 734 (Breyer, J., concurring) (discussing the danger of criminalizing false statements "made with or without accompanying harm").

There are additional ways true, undoubtedly protected speech, gets lumped in. As discussed above, *true* statements about Minnesota's election laws could violate Subdivisions 1 and 3. Moreover, the Speech Code authorizes both preemptive actions challenging speech that may occur and vicarious liability. *See* Minn. Stat. § 211B.075, subd. 4(1), subd. 5(b). That means a County Attorney or private party could accuse the Minnesota Voters Alliance, or any other person, of violating the Speech Code despite the fact that they have only made true, informative statements about voter eligibility in Minnesota.

Defendants also have no answer for Plaintiffs' argument that poll challengers could face consequences under the Speech Code. The County

33

Attorney says there is "no basis whatsoever to believe that the poll challenger would somehow face additional consequences under Section 211B.075." County Reply, Dkt. 41, at 4. Bluster aside, the text of Subdivision 2 provides a pretty reasonable basis for Plaintiffs' concern. The Speech Code prohibits the transmission of information "by any means"—including by a poll challenger— that "intends to impede or prevent another person from exercising the right to vote." Minn. Stat. § 211B.075, subd. 2(a)(1). Although it applies to only known "materially false" statements, Minnesota poll challengers now have good reason to be concerned that honest mistakes could result in them being hauled into court. That fact alone is enough to demonstrate that the Speech Code is overbroad. *See Alvarez*, 567 U.S. at 733 (Breyer, J., concurring) ("[T]he threat of criminal prosecution for making a false statement can inhibit the speaker from making true statements, thereby 'chilling' a kind of speech that lies at the First Amendment's heart.").

## C.    The Speech Code is unconstitutionally vague.

The Attorney General claims that the Speech Code is not unconstitutionally vague because it contains an intent requirement. This argument, however, does not address Subdivision 1, which contains no intent requirement. *See* Minn. Stat. § 211B.075, subd. 1(b) ("The plaintiff does not need to show that the defendant intended to cause the victim to feel intimidated."). As to the remaining subdivisions, the Attorney General misstates the import of

*Counterman v. Colorado*. There, the Court discussed the "subjective mental-state requirement" for "true threats." 143 S. Ct. at 2114–15. Notably, the only part of the Speech Code that Defendants claim covers only true threats, Subdivision 1, is missing *Counterman*'s required intent provision. And the remaining subdivisions plainly apply to speech that is not threatening in any manner and protected. Outside of the true-threat context, the Supreme Court has not accepted the simple application of a *mens rea* element to save broad, vague statutes. *See, e.g.*, *Alvarez*, 567 U.S. at 736–37 (explaining that in broad statutes, "there remains a risk of chilling that is not completely eliminated by *mens rea* requirements"); *281 CARE Committee II*, 766 F.3d at 790 (*mens rea* does not reduce chilling effect).

Resort to a common dictionary does not save the Speech Code either. If anything, the Attorney General's dictionary definitions demonstrate that the Speech Code is not capable of any saving construction. For example, the Attorney General defines "hinder" as to "impede[ or] delay." AG MTD Mem., Dkt. 25, at 24. That means any act which simply *delays* a person's voting or aiding another person in voting violates Subdivision 3. The temporary slowing down of someone's voting experience is not a cognizable harm, nor does the State serve a compelling government interest by prohibiting it. *See True the Vote*, 2024 U.S. Dist. LEXIS 22, at *127–28 (explaining that delays which "prolonged her voting experience" did not constitute reasonable intimidation).

Similarly, the Attorney General defines "interfere" as to "meddle[ or] obstruct a process." AG MTD Mem., Dkt. 25, at 24. The inclusion of the word "meddle" provides no additional clarification of what sorts of activities may violate the Speech Code. Is simply "busy[ing] oneself unduly with others' concerns" enough? *Oxford American Dictionary of Current English* 492 (1999) (defining meddle). Defining broad terms within the Speech Code with more broad terms demonstrates that the Speech Code is "so standardless that it authorizes or encourages discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008).

## D.    The Speech Code is a prior restraint.

To be sure, prior restraints are usually found where individuals must seek the government's permission to speak. *See, e.g.*, *Turning Point USA at Ark State Univ. v. Rhodes*, 973 F.3d 868, 878 (8th Cir. 2020) (a university's policy requiring permission to use a public space constituted a prior restraint); *Browman v. White*, 444 F.3d 967, 980 (8th Cir. 2006) (same). But the Attorney General is simply incorrect that the prior-restraint doctrine is *only* relevant in the context of judicial and administrative orders. *Emineth v. Jaeger*, 901 F. Supp. 2d 1138 (D.N.D. 2012), is instructive. There, the District Court considered an electioneering ban that "outlaw[ed] speech about candidates, parties, and ballot measures on any election day." *Id.* at 1143. As the court explained, "[r]ather than punishing speech that interferes with the fair and

orderly administration of elections where such speech takes place, the law was issued in advance of the time the forbidden communications are to occur." *Id.* As a result, "[t]he electioneering ban broadly prohibits speech both on its face and by inducing excessive caution on the part of the speaker." *Id.* The court held that the law was both an unreasonable prior restraint and content-based restriction on speech that did not satisfy strict scrutiny. *Id.* at 1146–47. The same is true of the Speech Code.

Furthermore, there is an even more obvious prior restraint hovering over this case. The County Attorney has already filed a counterclaim for Plaintiffs' speech. And he threatens that he may initiate additional proceedings if Plaintiffs "engage in widespread efforts to single out those Anoka County residents with felony convictions and attempt to interfere with their ability to cast a ballot." County PI Opp., Dkt. 42, at 15 n.3. This case is thus like *Weaver v. Bonner*, 309 F.3d 1312, 1323 (11th Cir. 2002), where a judicial committee could send a cease-and-desist letter demanding that a judicial candidate stop engaging in certain speech. Just like the receipt of a "cease and desist request . . . is an impermissible prior restraint on protected expression," so too are the County Attorney's direct threats to continue to police Plaintiffs' speech.

### V.    The *Anderson-Burdick* framework does not shield the Speech Code from First-Amendment scrutiny.

For all the reasons discussed above, the Speech Code does not survive constitutional scrutiny. The Attorney General attempts to save it by claiming that the *Anderson-Burdick* framework allows this Court to uphold the Speech Code without giving the First Amendment a second thought.

Precedent, however, demonstrates that the *Anderson-Burdick* framework does not apply. So far, Supreme Court precedent applying the *Anderson-Burdick* framework covers speech directly connected to the ballot itself or who the *government* says can vote—not who Plaintiffs say can. *See Anderson v. Celebrezze*, 460 U.S. 780 (1983) (filing deadlines); *Storer v. Brown*, 415 U.S. 724 (1974) (ballot access); *Burdick v. Takushi*, 504 U.S. 428 (1992) (write-in voting); *Tashijan v. Republican Party of Conn.*, 479 U.S. 208 (1986) (voter eligibility for primaries). These regulations all have in common that they "control the mechanics of the electoral process." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 345 (1995). That is why the *McIntyre* Court refused to apply *Anderson-Burdick* to an Ohio statute prohibiting the distribution of anonymous campaign literature. *Id.* at 345–46. The rule was a "direct regulation of the content of speech." *Id.* at 345. And it was a content-based restriction, not a *nondiscriminatory* regulation. *Id.*

The same is true here, and the Attorney General's principal case, *Mazo v. New Jersey Secretary of State*, 54 F.4th 124 (2d Cir. 2022), says so. As the Second Circuit explained, there are two primary factors in distinguishing between regulations targeting "pure speech"—and subject to traditional First Amendment scrutiny—and those governing "the mechanisms of the electoral process"—subject to the *Anderson-Burdick* framework. *Id.* at 142. The first factor is the "location and timing" of the prohibited speech, *Id.* Here, the Speech Code applies to speech that takes place far away from the polling place. Indeed, it reaches almost any speech uttered about voter eligibility, even if nobody potentially implicated hears it. The second factor is even more obviously in Plaintiffs' favor. It looks to the "nature and character" of prohibited speech. *Id.* The *Mazo* court explained that courts decline to apply *Anderson-Burdick* to laws "directed to the type of interactive, one-on-one communication that constitutes core political speech." *Id.* at 143. Mechanical regulations like write-ins on a ballot do not have "the potential to spark direct interaction and conversation," while speech about voter eligibility does. *Id.* The *Anderson-Burdick* framework, therefore, does not apply.

**VI.    A preliminary injunction is appropriate.**

**A.    The Court may and should enter an injunction stopping the Defendants from enforcing the law at issue.**

County Attorney Johnson argues that this Court, which has now issued preliminary injunctions against the enforcement of three (3) separate laws passed by the Minnesota Legislature in 2023, including laws specifically alleged to violate the First Amendment if allowed to be enforced, does not have the authority to do so. *Loe v. Walz*, Dkt. 20, No. 23-cv-01527-NEB-JFD (D. Minn. June 14, 2023)[14]; *Ass'n for Accessible Medicines v. Ellison*, No. 23-cv-2024-PJS-JFD, 2023 U.S. Dist. LEXIS 214781 (D. Minn. Dec. 4, 2023); *Minn. Chamber of Commerce v. Choi*, No. 23-cv-2015-ECT-JFD, 2023 U.S. Dist. LEXIS 226381 (D. Minn. Dec. 20, 2023). This is an astonishing claim. The very issuance of these preliminary injunctions demonstrates that Johnson's position is wrong; a preliminary injunction is certainly available to Plaintiffs here.

Johnson claims that issuing relief like the Court did in *Loe*, *Association for Accessible Medicines*, and *Minnesota Chamber of Commerce* is akin to awarding the "ultimate relief" sought in the Amended Complaint. County PI Opp., Dkt. 42, at 8–9. Not so. It is an award of "preliminary relief," which can later be made "permanent." Thus the difference between "preliminary" and

---

[14] The *Loe* Court entered a preliminary injunction upon stipulation of the parties.

"permanent" injunctions. In fact, the Eighth Circuit just issued a preliminary injunction where the plaintiff-parents alleged that their children's speech would be chilled by a school district policy. *Parents Defending Educ. v. Linn Mar Cmty. Sch. Dist.*, 83 F.4th 658, 667 (8th Cir. 2023). The Eighth Circuit did the same thing vis-à-vis a state statute restricting speech in *Dakotans for Health v. Noem*, 52 F.4th 381, 392 (8th Cir. 2022). The natural effect of this is to prevent the enforcement of the policy *preliminarily*, *while the lawsuit is pending*, even though that is also the end-goal of the lawsuit, just in permanent fashion. That is what Plaintiffs seek here—Court-ordered nonenforcement of the Speech Code by the Defendants while this case proceeds.

The County Attorney argues that the Eighth Circuit held that preliminary relief is not available pursuant to the recent *Lindell v. United States*, 82 F.4th 614 (8th Cir. 2023), where Mike Lindell sought to stop federal law enforcement from "investigation" of him or "accessing or taking other action with respect to his cell phone." *Id.* at 618. The court affirmed the denial of injunctive relief, refusing to stop law enforcement from investigating alleged criminal activity, which if allowed would end the possibility of a criminal prosecution—the "end goal" of the litigation, which was merely a "tactic to, at a minimum, interfere with and, at most, enjoin a criminal investigation." *Id. Lindell* is nothing like this motion, which seeks to prevent any enforcement of a speech restriction on

Plaintiffs, just like the *Parents Defending Education* plaintiffs sought to enjoin the application of a vague speech policy on their children at school.

**B.    The County Attorney admits that he may enforce the law in other proceedings while this case is pending in this Court, which would upset the status quo.**

Plaintiffs truly do appreciate that the County Attorney stipulated to an extension for Plaintiffs to respond to the Counterclaim, because it saves resources for everyone involved—Plaintiffs don't have to move to dismiss the Counterclaim yet, where the Counterclaim relates in large part to the applicability of the law to Plaintiffs, as opposed to its constitutionality. And the County Attorney doesn't have to defend its Counterclaim. But the County Attorney's claim that this ends the injunction analysis is wrong.

It is wrong precisely because the County Attorney admits he may seek to initiate proceedings against Plaintiffs if they "engage in widespread efforts to single out those Anoka County residents with felony convictions and attempt to interfere with their ability to cast a ballot." County PI Opp., Dkt. 42, at 15 n. 3. The problem with that characterization is that the County Attorney says he already considers Plaintiffs' political speech about the Minnesota Constitution to be a "true threat" to felons in Anoka County (even though, in reality, it isn't—not even close). *Id.* at 25. In other words, despite the County Attorney's claim in his footnote 3, Plaintiffs' speech need not change one iota for him to start prosecuting in a separate matter, based on some new allegation

of the same speech. The County Attorney can't call Plaintiffs' speech a true

threat and then claim Plaintiffs don't credibly fear him prosecuting them. The

County Attorney's admission that he reserves the right to prosecute based on

speech consistent with what Plaintiffs believe to be true amply supports a

preliminary injunction here. Without an injunction, the County Attorney could

make good on his threats, which would alter the status quo[15] in a manner that

would deprive Plaintiffs of their First Amendment rights.

Further, because the County Attorney and the Attorney General are

charged with the enforcement of the statute, there is a credible threat of

prosecution that this Court can enjoin. *See, e.g.*, *281 CARE Committee I*, 638

F.3d at 627–31. It doesn't matter that a future prosecution depends on what

Plaintiffs may say in the future. With that exact consideration in mind, the

Eighth Circuit in *281 CARE Committee I* held that there was an objectively

reasonable chill created by Minn. Stat. § 211B.06:

> Plaintiffs allege a desire to use political rhetoric, to exaggerate,
> and to make arguments that are not grounded in facts. In turn,
> they have presented allegations of their reasonable worry that
> state officials and other complainants—including their political

---

[15] The timing of this motion has nothing to do with whether it should be
granted. Under clear Eighth Circuit precedent, "[d]elay is only significant if
the harm has occurred and the parties cannot be returned to the status quo."
*Ng. v. Bd. of Regents*, 64 F.4th 992, 998 (8th Cir. 2023). Because the status quo
here is that Plaintiffs are not subject to any lawsuits over their speech beyond
the scope of this litigation, the Court can maintain the status quo by issuing a
preliminary injunction.

43

opponents who are free to file complaints under the statute—will interpret these actions as violating the statute.

*Id.* at 630.

And furthermore, fear about actions a government defendant may take against a plaintiff in the future[16] is *exactly the point* of a preliminary injunction. *Dakotans for Health*, 52 F.4th at 392. Defendants' arguments to the contrary are foreclosed by well-established Eighth Circuit precedent.

**C.   Plaintiffs' speech has already been chilled, and that irreparable harm will continue absent injunction.**

The County Attorney argues that Plaintiffs disregarded the three *Dataphase* factors other than likelihood of success on the merits. County PI Opp. 11. This is not true; rather, Plaintiffs briefly addressed the other factors because the likelihood of success on the merits factor is normally determinative in First Amendment cases. *E.g.*, *Child Evangelism Fellowship of Minn. v. Minneapolis Spec. Sch. Dist. No. 1*, 690 F.3d 996, 1004 (8th Cir. 2012) ("The likely First Amendment violation further means that the public interest and the balance of harms (including irreparable harm to CEF) favor granting the injunction."); *Dakotans for Health*, 52 F.4th at 392 (only engaging in a cursory examination of other preliminary injunction factors after finding likelihood of success in favor of the plaintiffs).

---

[16] See note 15, *supra*.

Other than likelihood of success on the merits, the most important factor is the irreparable harm Plaintiffs face because of the Speech Code. In their verified Amended Complaint, they explicitly state that their speech has been and will be chilled because of the Speech Code and Defendants' credible threat of enforcement of the Speech Code. Am. Compl. ¶¶ 18, 20, 24, 27, 29, 31, 68, 75, 80, 90, 92, 114, 131, 141. And the Court knows that the County Attorney's threat is not idle. As Plaintiffs pointed out before, Pls.' PI Mem., Dkt. 35, at 3, deprivation of First Amendment rights for any length of time is irreparable harm. And if, as Plaintiffs argue, the law is not narrowly tailored, the balance of harms overwhelmingly favors Plaintiffs because the state "has no interest in enforcing overbroad restrictions that likely violate the Constitution." *Dakotans for Health*, 52 F.4th at 392.

Finally, just because Plaintiffs intend to continue saying what they have said does not mean they have not been chilled and are not being chilled. The standard is an objective one. While the Court certainly may consider Plaintiffs' willingness to speak in its analysis, black-letter Eighth Circuit law holds that a person of ordinary firmness, facing potential prosecution because of speech, is reasonably chilled from speaking. *281 CARE Committee I*, 638 F.3d at 630.

## CONCLUSION

For the foregoing reasons, the Court should grant Plaintiffs' motion for a preliminary injunction.

Respectfully submitted,

**UPPER MIDWEST LAW CENTER**

Dated:  January 9, 2023         */s/ James V. F. Dickey*
Douglas P. Seaton (#127759)
James V. F. Dickey (#393613)
8421 Wayzata Blvd., Suite 300
Golden Valley, Minnesota 55426
doug.seaton@umlc.org
james.dickey@umlc.org
(612) 428-7000

**LIBERTY JUSTICE CENTER**

Reilly Stephens*
440 N. Wells Street, Suite 200
Chicago, Illinois 60654
(312) 637-2280
rstephens@ljc.org
 * *Pro hac vice*

*Attorneys for Appellants*